ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Virgil Liptak d/b/a Designed | ) | 03 B 29854 |
| Financial Services, | ) | Adv 03 - 3732    **EOD**    JAN 2 2 2004 |
| | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |
| | ) | |
| | ) | |
| | ) | |

### AMENDED MEMORANDUM OPINION

Chapter 11 debtor Virgil Liptak ("Liptak"), a resident of Dallas, Texas, filed this Chapter

11 bankruptcy case in Chicago on July 16, 2003, as a business bankruptcy case involving his sole

proprietorship Designed Financial Services, a provider of financial-planning and business-

management services. The assets and liabilities regarding this case, however, have no direct

links to Liptak's business; his most recent source of income is the interest and dividends from

savings and investments, including approximately $100,000 during the two years prior to filing

this case and $1800 per month at the time of filing.

The controversy herein stems from the debtor's 1993 divorce from Elizabeth Thornhill

("Thornhill") and the June 11, 2001 judgment she received against him in the District Court of

Dallas County in Texas that essentially vacated and amended parts of the December 1993 Agreed

Decree of Divorce and Agreement Clarifying Agreed Decree of Divorce. In the original property

settlement which he drafted, Liptak received a 35% interest in a partnership, R.E. Colgin I, Ltd.,

and the right to receive 63.8% of the profits from the same while in active management. He also

obtained a right to receive 39% of the first $500,000 in proceeds from a personal-injury lawsuit

in which he and Thornhill were co-plaintiffs against Showa Denko at the time of the divorce. By

the time the parties settled and dismissed the lawsuit against Showa Denko in 1995, the divorce

decree and property settlement were already final, and Liptak received $195,000 of the proceeds

of that lawsuit in accordance with the property-division stipulation of the divorce decree. Liptak

continued to provide financial and management services for R.E. Colgin I, Ltd. until Thornhill as

the majority interest holder terminated his employment with the business and sued him in the 95th

Judicial District of Texas to enforce the termination provision of his employment contract and to

require the turnover of business documents.

A variety of state-court litigation involving both the property-division decree from the

divorce and Liptak's work for R.E. Colgin I, Ltd. ensued over the next seven years in state and

federal courts, most of which was not clearly delineated, explained, or documented for this Court

by either party. Apparently, though, Thornhill ultimately prevailed in most if not all of this

litigation. Liptak, not being as fortunate, according to the assertions of Thornhill's attorney,

resorted to suing every person to whom he could attribute fault for his litigation losses – state-

court judges, law firms, Thornhill's next husband, a sheriff, a court reporter, and a district court

clerk – with the end result being that he was deemed a vexatious litigant under Texas's statutory

law. *See* Tex. Civ. Prac. & Rem. Code Ann. § 11.054 (Vernon Supp. 2002); *Liptak v. Thornhill*,

2002 WL 31730926, at *3 (Tex. App. 2002). Liptak did not rebut or deny any of these

assertions.

The one prior lawsuit and resulting judgment clearly presented to this Court was

Thornhill's aforementioned "bill of review" action, which alleged that Liptak fraudulently

withheld information and assets from her during their divorce proceeding. The resulting

judgment attached to Thornhill's proof of claim, *see* Bankruptcy Rule 3001(c), was ultimately

2

successful in attacking their agreed 1993 property settlement and comprises virtually all of the debt in this Chapter 11 case and therefore would present the centerpiece for dispute in this bankruptcy case. Based on the jury's answer to various questions, the judge presiding over the "bill of review" action redistributed portions of the their marital estate by awarding Thornhill (1) the $195,000 plus prejudgment interest for the settlement proceeds from their joint lawsuit against Showa Denko; (2) the 35% interest in Richard E. Colgin I, Ltd.; (3) $1,100,000 in exemplary damages; (4) attorneys' fees for all present and future stages of the bill-of-review lawsuit in the amount of $303,000; and (5) courts costs in the amount of $2043.17. The June 11, 2001 judgment explicitly voided and superseded portions of the December 1993 "Agreed Decree of Divorce and Agreement Clarifying Agreed Decree of Divorce" and additionally dismissed with prejudice Liptak's counterclaims and third-party claims against Elizabeth Thornhill, Kerry Thornhill, and Richard E. Colgin Company. The Texas Court of Appeals subsequently affirmed the judgment, which is now awaiting a decision concerning whether discretionary review by the Texas Supreme Court will proceed.

Given the nature and extent of the litigation occurring between the two parties, Thornhill not surprisingly had great difficulty collecting her judgment during the two and a half years following her court victory, even though Liptak never actually posted an appeal bond to stay enforcement and collection of the June 2001 judgment. Thornhill proceeded with her collection attempts by initiating various garnishment and foreign-money-judgment collection lawsuits against the third parties holding Liptak's accounts. Thornhill successfully collected $2014.28 through a garnishment suit against World Savings & Loan Association in Dallas County; froze $390,000 that is currently being held by the district court clerk for Dallas County; and also sued

3

the Vanguard Group in a garnishment suit in Pennsylvania to recover one of Liptak's accounts

worth approximately $1,774,000 to $1,784,000.

Liptak managed to stall two of the pending collection proceedings by filing the instant

Chapter 11 bankruptcy case with its concomitant automatic-stay protections in § 362(a), but only

after failing in his effort to obtain an emergency stay of Thornhill's Pennsylvania action against

the Vanguard Group from the 68th Judicial District of Texas.  In the 68th District, he argued that

the court had an obligation to reopen the Showa Denko lawsuit to protect its award of $195,000

to Liptak against Showa Denko (not against Thornhill).  Liptak then tried to get this same

argument in front of the federal court administering his bankruptcy case by filing a notice of

removal for the Showa Denko lawsuit and then asking a bankruptcy judge for the federal judicial

district embracing the 68th Judicial District of Texas to transfer it as an "adversary proceeding"[1]

to the Northern District of Illinois where his bankruptcy case was pending.  On September 15,

2003, the bankruptcy judge for the U.S. Bankruptcy Court for the Northern District of Texas

remanded[2] the civil action back to the Texas state court where it had been dismissed eight years

earlier rather than transfer the venue of the "adversary proceeding" under 28 U.S.C. § 1412 to the

U.S. Bankruptcy Court for the Northern District of Illinois.  As part of his bankruptcy case,

Liptak filed the exact same lawsuit as Adversary Proceeding # 03-03732 against Thornhill in this

Chapter 11 case.  The ensuing confusion over the Texas bankruptcy court's remand of the same

basic lawsuit has produced cross motions for dismissal or for partial summary judgment on

Adversary Proceeding # 03-03732.

---

[1]28 U.S.C. § 1334(b); **Fed. R. Bankr. Pro.** 7001.

[2]28 U.S.C. § 1452(b).

Liptak filed another notice of removal in the U.S. District Court for the Northern District of Texas for his pending lawsuit in the 255th Judicial District of Texas against Mark Stewart, Sheriff Jim Bowles, and Bank One. The status of this adversary proceeding is not known to the Court at this time, but it has no separate docket entry or adversary number indicating that removal and transfer were effectively accomplished.

Thornhill filed a motion to dismiss Liptak's Chapter 11 bankruptcy case for "cause" pursuant to 11 U.S.C. § 1112(b), alleging that Liptak did not file this case in good faith as required by law. She also requests dismissal or transfer of the case for improper and inconvenient venue under 28 U.S.C. § 1408(1) and Bankruptcy Rule 1014(a). The Court heard three hours of evidence during the afternoon of November 19, 2003, on Thornhill's motion to dismiss for cause or to transfer the bankruptcy case to the more convenient forum of the Northern District of Texas. Only Liptak presented evidence during this hearing on the contested motion,[3] with Thornhill's attorney and the U.S. Trustee being satisfied to meet their burden of proof using only their legal arguments based on Liptak's evidence as well as his Chapter 11 bankruptcy petition and schedules and records from the Texas U.S. Bankruptcy Court. An accurate picture of the various Texas legal proceedings was difficult to grasp in no small part because some of Liptak's evidence presented incomplete information. For instance, he offered evidence to show that Thornhill's bill of review action was originally dismissed on January 29, 1996, for failure to present a *prima facie* case of what would have been a meritorious claim or defense in the divorce proceeding; however, Thornhill subsequently prevailed as evidenced by the June 11, 2001 bill of

---

[3]Liptak offered as evidence exhibits A through T, and the Court admitted exhibits A, D, E, F, G, I, J, K, M, N, Q, and R.

review judgment.

In considering the totality of the circumstances and all of the evidence and arguments presented at the hearing, the Court believes that this is the extraordinary situation where the creditor has met her burden of proof on a motion to dismiss by using the debtor's evidence, verbal and written admissions, bankruptcy schedules, and statement of financial affairs to show that the debtor failed to meet the good-faith filing requirement for Chapter 11 bankruptcy cases.

### Discussion and Conclusions of Law

Even though § 1112(b) permits involuntary dismissal for an enumerated, nonexclusive list of ten grounds, its general authority to dismiss Chapter 11 bankruptcy cases "for cause" has permitted the development of common-law grounds for dismissal. Accordingly, federal courts have required a good-faith filing requirement for debtors opposing dismissal "for cause" under § 1112(b). *See In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994); *In re International Oriental Rug Center*, 165 B.R. 436, 442 (Bankr. N.D. Ill. 1994); *In re N.R. Guaranteed Retirement*, 112 B.R. 263, 270-71, 279 (Bankr. N.D. Ill. 1990) (quoting *In re Madison Hotel Associates*, 749 F.2d 410, 426 (7th Cir. 1984)); *In re Gleason*, 2002 WL 570647, at *1 (N.D. Ill. 2002); *Matter of Love*, 957 F.2d 1350, 1354 (7th Cir. 1992) (same for Chapter 13 case); *cf. Matter of Little Creek Development Co.*, 779 F.2d 1068, 1071-72 (5th Cir. 1986). The moving party in interest bears the burden of proof by a preponderance of the evidence on such a motion to dismiss. *In re International Oriental Rug Center*, 165 B.R. 436, 443 (Bankr. N.D. Ill. 1994); *In re Gleason*, 2002 WL 570647, at *1 (N.D. Ill. 2002); *Matter of Woodbrook Associates*, 19 F.3d 312, 317 (7th Cir. 1994); *cf. In re McNichols*, 258 B.R. 892, 902 (Bankr. N.D. Ill. 2001) (in Chapter 13 case, creditor's burden of proof for showing case not filed in good faith is higher than for showing plan

6

not filed in good faith); *Matter of Love*, 957 F.2d 1350, 1355-56 (7th Cir. 1992) (same

conclusion, but also declining to impose "extraordinary circumstances requirement" for such a

dismissal). *Contra In re Leavitt*, 209 B.R. 935, 940 (B.A.P. 9th Cir. 1997) (debtor has burden of

proof to show a case is filed in good faith), *affirmed*, 171 F.3d 1219 (9th Cir. 1999); *In re*

*Carbaugh*, 299 B.R. 395, 399 (Bankr. N.D. Tex. 2003) (same); *In re Bingham*, 68 B.R. 933

(Bankr. M.D. Pa. 1987) (same).

    To make the requisite showing, the movant need not show, though it would be relevant,

that the debtor had any sort of fraudulent or malicious intent or scheme in mind when filing;

"malfeasance is not a prerequisite to bad faith." *In re Leavitt*, 209 B.R. 935, 940-41 (B.A.P. 9th

Cir. 1997), *affirmed*, 171 F.3d 1219 (9th Cir. 1999); *cf. Matter of Love*, 957 F.2d 1350, 1360-61

(7th Cir. 1992) (same for Chapter 13 case). Because one of the purposes of § 1112(b) is to short

circuit the plan-confirmation process when it would be useless or improper, a movant can

successfully request dismissal even if the debtor has not submitted a plan or run out of time to do

so exclusively. *Matter of Woodbrook Associates*, 19 F.3d 312, 317 (7th Cir. 1994); *In re*

*Metropolitan Realty Corp.*, 433 F.2d 676, 679 (5th Cir. 1970).

    What the movant must positively demonstrate to show a lack of good faith in filing has

been stated in a variety of ways, and courts have noted that focusing on terms such as good or

bad faith in filing is misleading to some degree, *see, e.g.*, *In re Huckfeldt*, 39 F.3d 829, 832 (8th

Cir. 1994), as the question is really whether the debtor has presented a legitimate reorganizational

objective within the scope of the Bankruptcy Code or rather has presented "tactical reasons

unrelated to reorganization," *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994); *see In re N.R.*

*Guaranteed Retirement*, 112 B.R. 263, 271 (Bankr. N.D. Ill. 1990). Generally, the Court must

consider the totality of circumstances surrounding a variety of objective and subjective factors, *see, e.g., In re Stump*, 280 B.R. 208, 214 n.2 (Bankr. S.D. Ohio 2002); *but see In re International Oriental Rug Center*, 165 B.R. 436, 442-43 (Bankr. N.D. Ill. 1994) (saying subjective intent not relevant but then saying an improper purpose for filing would constitute bad faith), and then determine whether, in light of the spirit of the Bankruptcy Code, the filing is fundamentally fair to creditors attempting to exercise their collection rights. *Matter of Love*, 957 F.2d 1350, 1355, 1357, 1359 (7th Cir. 1992) (Chapter 13 dismissal under § 1307(c)); *In re Leavitt*, 209 B.R. 935, 939-41 (B.A.P. 9th Cir. 1997), *affirmed*, 171 F.3d 1219 (9th Cir. 1999).[4] Obviously, this formulation does not give bankruptcy courts much guidance or provide would-be debtors with a uniform idea of how to structure their pre-filing conduct. Several opinions have fortunately identified recurring patterns that exemplify situations strongly suggesting that a Chapter 11 case has been filed in bad faith.

This individual Chapter 11, though, does not call for the usual analysis that bankruptcy courts perform when determining whether a true *business* has filed a Chapter 11 petition in good faith because it has a need to restructure debt in order to survive. Usually this analysis looks at general considerations such as those recognized by Judge Schmetterer in *In re International Oriental Rug Center*, 165 B.R. 436, 442 (Bankr. N.D. Ill. 1994):

---

[4] The Seventh Circuit's case law concerning dismissal for lack of good faith in Chapter 13 cases under § 1307 is also relevant because an *individual* Chapter 11 case is really just a debtor-controlled alternative to a Chapter 13 case, and the individual aspects of this Chapter 11 case predominate over any business aspects that may be present here. *Cf. Matter of Love*, 957 F.2d 1350, 1356 (7th Cir. 1992) ("[T]he good faith analyses differ under Chapter 11 and Chapter 13 because businesses and individuals are obviously different. *Id.* Indeed, as a consequence of this difference between individuals and businesses, objective futility seems meaningless in the Chapter 13 context. Objective futility in the Chapter 11 context focuses on whether a business is capable of surviving after reorganization. . . . . This is not an issue in an individual bankruptcy filed under Chapter 13 because, ordinarily, an *individual's* survival is not related to what happens in the Chapter 13 proceeding.") *with In re N.R. Guaranteed Retirement*, 112 B.R. 263, 273 (Bankr. N.D. Ill. 1990) ("only if the debtor has the clear ability to *survive* without bankruptcy court protection") (emphasis added).

> Chapter 11 was designed by Congress to prevent waste and reduction in assets
> that result from unnecessary liquidation. Congress meant to encourage financial
> restructuring and to re-establish efficient business operations with the goals of
> permitting greater payments to creditors than could otherwise be made, while also
> preserving jobs and shareholders' interest. *See, e.g., In re HBA East, Inc.*, 87 B.R.
> 248, 259 (Bankr.E.D.N.Y.1988), citing H.R. Rep. No. 595, 95th Cong., 1st Sess.
> at 220-21 (1977), *reprinted in* 1978 U.S.C.C.A.N. pp. 5787, 5963, 6179. The
> good faith standard is the bankruptcy court's equitable mechanism for assuring
> that a Chapter 11 case has at least the potential to serve those purposes.

*Id.* (citing *In re Schlangen*, 91 B.R. 834, 837 (Bankr. N.D. Ill. 1988)). Thus, in *International*

*Oriental Rug* for instance, Judge Schmetterer found that the movants did not meet their burden of

proof on the lack-of-good-faith issue in part because the "[d]ebtor was a real business employing

sales people and selling products." *Id.* at 443. Liptak's discontinuance of Designed Financial

Services, though, does not affect employees, shareholders, or any current customer or client base

producing a cash flow of potential future use for existing creditors. *Cf. Matter of Little Creek*

*Development Co.*, 779 F.2d 1068, 1073-74 (5th Cir. 1986). The debts in his Chapter 11 case do

not stem from his conduct regarding this business, and his cessation of operations appear to be

the result of his conscious choice to use his time and energy to pursue (as a *pro se* litigant) every

conceivable avenue of relief to undo Thornhill's 2001 legal victory, not the result of any creditor

action that is directly or conclusively preventing him from providing financial and management

services to clients.

On the other hand, Liptak does not fit the most typical scenario for individuals who file

(primarily Chapter 7 and 13) bankruptcy cases without good faith by failing to file accurate (or

any) schedules and statements of affairs, not appearing at the meeting of creditors or scheduled

court hearings, not sending in plan payments, proposing multiple unconfirmable payment plans,

concealing assets, and/or filing multiple serial cases after dismissal. *In re McNichols*, 258 B.R.

9

892, 902 (Bankr. N.D. Ill. 2001); *In re N.R. Guaranteed Retirement*, 112 B.R. 263, 276-77

(Bankr. N.D. Ill. 1990) (citing *In re Metz*, 820 F.2d 1495, 1497 (9th Cir. 1987)); *e.g.*, *Matter of*

*Love*, 957 F.2d 1350, 1352-53, 1357-59 (7th Cir. 1992).

In spite of these analytical difficulties, other identified tests for good or bad faith can be

sensibly applied to the current situation. Four standard scenarios exemplifying a Chapter 11 case

being filed without good faith were discussed by Judge Wedoff in *In re Guaranteed Retirement*,

112 B.R. 263 (Bankr. N.D. Ill. 1990); two of these are particularly useful here. The first focuses

on the need for a bankruptcy case in light of the debtor's financial condition and the type of

assets available for satisfying judgments; the second focuses on the case's effect on creditors'

nonbankruptcy collection rights and whether it is merely being used as a tactic to delay pursuit of

these rights without any offsetting benefits to the creditor body. The Court will address each

issue.[5]

### A. *Liptak's Need for Bankruptcy Relief and Ability to Satisfy Judgments*

The general test for determining whether a debtor has a need for filing a Chapter 11 case

that is legitimate enough to justify the impact on a judgment creditor's rights has been stated as

follows:

> "[A] Chapter 11 filing is in good faith and may be used to replace an appeal bond
> if the judgment against the debtor is so large that the debtor faces severe
> disruption of his business if enforcement of the judgment is not stayed. However,
> if the debtor has the ability to satisfy the judgment from non-business assets, then
> it is bad faith to attempt to use the bankruptcy laws to appeal without posting a
> bond." . . . The timing of any bankruptcy filing may be relevant to determining
> whether the debtor acted to delay creditors unnecessarily . . . , but there is nothing

---

[5]The other two focus on the so-called "new debtor syndrome" and a shell company's inability to reorganize under any type of plan. *See generally In re N.R. Guaranteed Retirement*, 112 B.R. 263, 273-76 (Bankr. N.D. Ill. 1990).

> improper in a debtor's thwarting state court collection proceedings by filing a
> Chapter 11 petition, as long as reorganization is both needed and feasible. *See In
> re McStay*, 82 B.R. 763, 768 (Bankr. E.D. Pa. 1988).

*In re N.R. Guaranteed Retirement*, 112 B.R. 263, 272-73 & n.7 (Bankr. N.D. Ill. 1990) (quoting

*In re Holm*, 75 B.R. 86, 87 (Bankr. N.D. Cal. 1987)); *see also In re Marsch*, 36 F.3d 825, 828-29

(9th Cir. 1994); *In re Gleason*, 2002 WL 570647, at *2 (N.D. Ill. 2002). The test is whether the

debtor has a business justification for thwarting a judgment creditor's collection activity and

forcing them to accept other (possibly reduced) future payment rights under a reorganization plan

in lieu of assets crucial to operating the business. This justification does not exist if the debtor

could have satisfied a judgment with funds and savings that were not being used to operate a

business.

Liptak contends that bankruptcy relief is necessary and appropriate here because

Thornhill has continued to sue him repeatedly on the same cause of action, thereby distracting

him to the point where the litigation is disruptive to his operation of Designed Financial Services,

and because she will do so in the future. Additionally, the garnishment actions against the

holders of his various financial accounts are threatening to deprive him of the funds that he

claims are his "business assets" necessary for him to earn a living. Finally, he argues that his use

of Chapter 11 is legitimate because its claim-objection procedure will allow him to finally

receive a fair trial for his long-standing dispute with Thornhill, which is allegedly impossible to

obtain in Texas; similarly, the bankruptcy case will provide a fairer forum for bringing as

adversary proceedings various noncore actions against various individuals in Texas.

   1. Liptak's Financial Condition and Purported Need to Reduce his Debt Load

As a legitimate purpose for this Chapter 11, Liptak argued that his debt load was at very

11

least reduced from $63 million to $2 million once the claims bar date passed, *see* Bankruptcy

Rule 3003(c), with only $2.1 million in proofs of claim being filed.

A review of Liptak's Chapter 11 bankruptcy petition reveals his and Designed Financial

Services' financial status as follows:

Liptak holds at least four financial accounts with funds totaling approximately

$4,089,000, the largest single one for $2,160,332 in Chicago forming the asserted basis for

appropriate venue in the Northern District of Illinois. Liptak lists his total ascertainable assets,

including all real and personal property, at $6,182,224 and his total estimated assets, including

those of unknown value, at over $10,000,000.

Liptak lists four disputed debts totaling $63,131,873. Three of the four debts are

somehow tied to Thornhill: one for $30,866,667 allegedly owed directly to Thornhill and two for

$32,254,334 owed to companies owned and controlled primarily by Thornhill, Richard E. Colgin

Co. and Richard E. Colgin I, Ltd. The fourth listed debt does not fall far from the Liptak-

Thornhill dispute. It is a debt of $10,872 owed to the law firm of Bourland Kirkman for legal

services rendered in litigating claims made by and against Thornhill in various civil proceedings

in Texas.

The filed proofs of claim do not come anywhere near $63,131,873. Other than the proof

of claim pertaining to the June 11, 2001 judgment now totaling $2,054,947.80 (when all costs,

attorneys' fees, and post-judgment interest are added), Thornhill has not filed a proof of claim for

any other judgment or debt; nor have her two closely held Colgin companies filed proofs of

claim. Indeed, the claims Liptak lists at $30,866,667 and $32,254,334 are not based on any

judgment, invoice, or lawsuit currently pending against him. They are based entirely on Liptak's

12

oral testimony that he believes that his wife and her closely held companies will sue him for
those amounts in the future because they have sued him or threatened to sue him on numerous
past occasions dating back to 1995. The scheduled claims purportedly for $30,866,667 and
$32,254,334 are Liptak's only basis for even hinting that he may be insolvent. The Court finds
that even if Liptak's subjective belief that he has disputed debts for these amounts is sincere, his
testimony in this regard is objectively unreasonable and gives it no weight. Why Thornhill
would risk filing a proof of claim for only $2,043,947.80 when she and her companies allegedly
have a right to ultimately collect over thirty times that amount is baffling. If they eventually do
resue Liptak for prepetition conduct, the doctrine of judicial estoppel might serve Liptak well.
Until then, the Court finds that Liptak has no *bona fide* claim to insolvency. The only other two
proofs of claim were Bourland Kirkman's for $10,872 and the IRS's for $60,784, which Liptak
had not scheduled as a debt, bringing the total of claims filed before the claims bar date to
$2,126,603.57. Liptak holds more than this amount in just one of his four financial accounts.

These facts also demonstrate that this case is predominantly a two-party dispute between
Liptak and Thornhill. The other two creditors are *de minimis* by comparison, and the debt to the
law firm of Bourland Kirkman is a product of the legal expenses Liptak incurred to battle
Thornhill. Even the phantom debts owed to the Colgin companies, which Liptak scheduled in
excess of $32,000,000, would be debts that do not stray an inch from the core Liptak-Thornhill
controversy, since Thornhill controls both of these companies.

It is true that insolvency is not a requirement for filing a bankruptcy case under any
Chapter. *In re International Oriental Rug Center*, 165 B.R. 436, 442, 444 (Bankr. N.D. Ill.
1994). That said, solvency is a factor to consider in determining whether a debtor has filed in

13

good faith because of his genuine need to preserve the going-concern value of a business. The number of creditors involved in a bankruptcy case, while not by any means dispositive, is also a relevant consideration. *See Matter of Little Creek Development Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986). That is, the more that the bankruptcy case appears to be a forum-shopping attempt for what is largely a two-party dispute, the less the debtor has a need for the type of bankruptcy relief contemplated by the Bankruptcy Code. *See In re International Oriental Rug Center*, 165 B.R. 436, 443 (Bankr. N.D. Ill. 1994) (citing *In re Schlangen*, 91 B.R. 834, 837 (Bankr. N.D. Ill. 1988)).

### 2. Liptak's Need to Halt Garnishment Actions, Preserve "Business Assets," and Jumpstart "Designed Financial Services"

Liptak's contention that he is in need of bankruptcy relief because Thornhill has sued him over and over again for eight years on the same cause of action fails to comprehend that exact nature of what a garnishment action or a suit to collect a money judgment in a foreign jurisdiction really is. If a judgment from another state qualifies as valid and enforceable, other state courts have a constitutional obligation to recognize the final judgment from the foreign state, even if it originated from a law that is at odds with the law of the state where the final judgment is being enforced. **U.S. Const.**, Art. IV, section 1; *Tronagun Corp. v. Mizerock*, 820 F. Supp. 225, 227 (W.D. Pa. 1993); *Reco Equipment, Inc. v. John T. Subrick Contracting*, 780 A.2d 684, 686-87 (Pa. Super. Ct. 2001); *Austin v. Westinghouse Elec. Corp.*, 59 Pa. D. & C.2d 178, 181-82, 184-85 (Pa. Com. Pl. 1972) (describing how the constitutional provision puts a foreign judgment in a higher position than a foreign statute). As long as the judgment creditor first "domesticates" the judgment in the foreign jurisdiction, *see, e.g.*, Uniform Enforcement of

14

Foreign Judgments Act, 42 **Pa. Cons. Stat. Ann.** sec 4306 (West 2003), he can use execution or

levy to collect from the tangible personal property of the judgment debtor in that jurisdiction, or

he could use garnishment to collect money from entities that 1) are susceptible to personal

jurisdiction in that jurisdiction and 2) owe debts to the primary judgment debtor (including banks

and employers). *See In re McAllister*, 216 B.R. 957, 971-74 & n.12 (Bankr. N.D. Ala. 1998);

*e.g.*, **Pa. R. Civ. Pro.** 3101-3149. *See generally* 38 C.J.S. *Garnishment* sec sec 63, 66, & 85

(2003). The garnishment and foreign judgment proceedings that Liptak labels as recurring

lawsuits for the same alleged wrong are the result of Thornhill's continuing efforts to collect a

debt from third parties owing money to Liptak. Liptak claims that this underlying debt is the

result of a civil proceeding ridden with legal errors, and he may well be correct about some of the

legal errors that resulted in his liability to Thornhill. However, as discussed below, the *Rooker-*

*Feldman* doctrine requires that those errors be corrected, if at all, through the Texas appellate

hierarchy (and then by the U.S. Supreme Court if a federal issue was presented to its highest

court), not by a federal court of original jurisdiction.

    As for the so-called "business assets" allegedly needed for reorganization, they are not

machinery, inventory, equipment, real estate, or other traditional types of capital assets; they are

liquid assets such as money-market accounts. No evidence suggests that the $2 million Thornhill

seeks to collect is absolutely necessary for Liptak to provide business-turnaround advice to

potential clients or that he uses his own funds to rehabilitate companies. The Court thinks that

"business assets" are readily distinguishable from the products of "business assets," and that only

the former are relevant when the issue is whether the debtor has used a bankruptcy case in good

faith to stall a creditor's levy on assets needed for reorganization. *Cf. Marsh*, 36 F.3d at 828-29.

15

A debtor cannot merely label funds he does not want applied to satisfy a single judgment as "business assets" in need of preservation, thereby justifying bankruptcy relief; he must show that the funds or assets are needed to actually operate a business producing goods or services. Otherwise, a debtor could simply evade the rule by investing his money in return for interest and/or dividends and then claiming that he was in the "business of investing" and needed bankruptcy protection to preserve his "business assets" – even though his money could readily be applied outside of bankruptcy to reduce creditors' claims.

Liptak argues that reorganization is appropriate under Chapter 11 of the Bankruptcy Code because Thornhill's continued efforts to collect her judgment by means of garnishment actions in various jurisdictions are consuming so much of his time and energy that he can no longer operate his turnaround and financial counseling business and thus faces losing his business's goodwill. Normally a Chapter 11 case is available to help preserve goodwill, as Congress intended, when a debtor's insolvency is about to cause its cessation. Liptak, once again, does not appear to have a bona fide claim to insolvency. Moreover, maximizing the going-concern value of a bankruptcy debtor by delaying creditors is a valid use of the Bankruptcy Code only when the indebtedness itself *causes* the debtor to face the loss of the going-concern value of his business. A desire to avoid paying a disputed debt that one is capable of satisfying is not sufficient to trigger this objective, especially if such desire unreasonably consumes the debtor to the point that he can no longer concentrate on running his sole proprietorship. The Court believes that Liptak would be fully capable of successfully operating his turnaround business if he simply chose to do so instead of conceiving yet another tactic to avoid paying the June 11, 2001 Texas state-court judgment. He has not shown inability to run his business; he has shown an unwillingness to pay

16

his debt to Thornhill, which he is able to pay with available liquid assets. Moreover, the dispute

over the debt to Thornhill has not at all been clearly linked to Liptak's current or potential

clients' willingness to pay for the services of his sole proprietorship, Designed Financial

Services. That is, why would they choose not to contract for debtor Liptak's turnaround advice

solely because his ex-wife continues to sue him to collect her judgment? The real problem that

Liptak fears is that he will no longer be able to earn interest on his accounts if Thornhill

successfully completes her garnishment actions. An individual person's business endeavor

consisting purely of earning interest is not the type of "business" Congress had in mind when it

designed Chapter 11 of the Bankruptcy Code. The Court finds that the purported disruption of

Designed Financial Services and any related loss of its goodwill is a pretextual purpose for the

filing of this Chapter 11 case.

3. Liptak's Need for Central Forum to Achieve a Global Settlement of All Pending Litigation

Liptak relies on *In re Hall*, 304 F.3d 743 (7th Cir. 2002), for the proposition that his

Chapter 11 filing is in good faith because it attempts to bring into one forum a multiplicity of

scattered lawsuits and then to achieve a simplified "global settlement" concerning all such

litigation. *See id.* at 746-47.

*Hall* was comparatively a more complex case in which the individual debtor had a

conceivable right to be in a Chapter 11 bankruptcy case; thus, the Seventh Circuit, with some

hesitation, found the bankruptcy court's factual finding that the debtor Hall had met the good-

faith filing requirement to be not clearly erroneous. *See id.* at 746-47. In *Hall*, the debtor owned

all interests in a corporation that was simultaneously a Chapter 11 debtor, and both debtors were

co-plaintiffs in a pending lawsuit against the company that sold the stock in the corporate debtor

to Hall. The corporate debtor was in trouble because it was the subject of a class-action lawsuit concerning its liability for the manufacture of furnaces, it had pending lawsuits against 24 insurance companies regarding its coverage for this alleged liability, and an insurance settlement that was key to settling the former suit fell through during the pendency of the corporate Chapter 11 case. *See id.* at 745, 747. Most significantly, though, Hall had obtained a loan of $7.5 million to purchase the stock of the corporate debtor, and both Hall and the corporation were liable for the purchase-price debt. For two reasons the Seventh Circuit found that Hall's filing of his Chapter 11 petition could have met the good-faith filing requirement, even though Hall had made false statements during his bankruptcy case. First, the concurrent Chapter 11 bankruptcy cases could have been a legitimate attempt to reach a "global settlement" by bringing into one court all of the aforementioned litigation tied to both debtors. *Hall,* 304 F.3d at 746-47. Second, Hall's actual solvency or insolvency was not at all readily apparent. His debt consisted largely of his contingent guarantor liability, the value of which was intimately tied to the resolution of the corporate Chapter 11 case. Similarly, his primary asset was the corporate stock, the value of which was also dependant upon the resolution of multiple lawsuits in which the corporate debtor was both a plaintiff and defendant. *Hall,* 304 F.3d at 748. Furthermore, the Seventh Circuit held that the lower court did not abuse its discretion in dismissing Hall's Chapter 11 case without prejudice, monetary sanctions, or attorneys' fees. *See id.* at 744-45, 749.

*Hall* does not help the debtor in this case, as the decision was primarily concerned with reviewing factual rather than purely legal issues, and the facts in this case are substantially different. Liptak does not hold as his primary asset a corporation with a simultaneously pending Chapter 11 case involving a class-action product-liability claim, 24 related lawsuits against

18

insurance companies, and a lawsuit against the company that sold him the stock in the corporate

debtor. He has not guaranteed the purchase of a simultaneously pending Chapter 11 debtor.

Instead, he is clearly solvent. He has no real need to bring voluminous litigation to one federal

forum in hopes of a "global settlement." As discussed above, most of the legal controversy in

this case is reducible to the common denominator of the disputed 1993 property-division decree

between Liptak and Thornhill. The eight years of state-court litigation involving these two

(while once voluminous) has for all practical purposes concluded in Texas, and the only legal

actions even pending now are Thornhill's post-judgment garnishment actions against the third

parties holding Liptak's assets. There is no "global settlement" to achieve at this point; the

bankruptcy case is just a blatant attempt to forestall a single creditor's post-judgment collection

proceedings, to collaterally attack the same judgment in violation of the *Rooker-Feldman*

doctrine, *see infra*, and to shop for a more favorable forum for suing Texas state or county

officials for alleged misconduct.

### 4. Liptak's Need to Marshal Assets for His Bankruptcy Estate by Prosecuting Lawsuits Against Third Parties in the Bankruptcy-Case Forum

Debtor-in-possession Liptak offered as another legitimate purpose for this Chapter 11

case the marshaling of assets to increase the value of his bankruptcy estate for creditors by means

of bringing counterclaims against Thornhill and related lawsuits against various third parties.

More specifically, Liptak intends to assert claims against various Texas individuals who are not

creditors in his case, including a sheriff who failed to deliver to him a certain bill of sale, by

means of bringing "noncore" adversary proceedings that are "related to" his bankruptcy case. 11

U.S.C. § 157(c).

19

Normally, such litigation has potential to brings funds into the bankruptcy estate, thereby increasing the dividend that creditors might receive from the otherwise insolvent debtor on account of its claim. The particular facts and circumstances of this case, however, indicate that the ultimate and sole purpose of bringing any such noncore proceedings is to receive an alternative and possibly more favorable forum to the state and federal courts in Texas. If Liptak successfully recovered money from his asserted noncore civil actions, Thornhill, by far the primary creditor in this case, would receive no greater dividend than if Liptak were unsuccessful; that is, because Liptak is actually solvent, the marshaling of assets by the bankruptcy estate is not intended for the benefit of creditors but is rather intended for the forum-shopping advantages that may accrue in favor of the debtor. The litigation of Liptak's alleged civil rights claims as non-core adversary proceedings, then, would not benefit his creditors and would only serve his forum-shopping needs. The Bankruptcy Code, as a limited-purpose statute, is not designed to provide relief in this scenario, regardless of the merit of Liptak's claims to abuse by the judicial system in Texas.

The preference and fraudulent-transfer actions that Liptak purportedly intends to bring as counterclaims against Thornhill appear to be facially meritless and as such are sham justifications for the existence of this case. More specifically, to recover a preference or a constructively fraudulent transfer, both types of actions require some type of insolvency during the 90 days or one year prior to the petition filing, *see* 11 U.S.C. §§ 547(b)(4), 548(a)(1)(B), and Liptak has no *bona fide* claim to insolvency. Similarly, a successful preference action would require that Thornhill would have received more than she would have in a hypothetical Chapter 7 liquidation case, but in a hypothetical Chapter 7 liquidation for the present scenario, a creditor of a fully

20

solvent debtor would have been paid in full anyway. *See* 11 U.S.C. §§ 547(b)(5), 726(a).

Finally, in an action to recover a factually fraudulent transfer to Thornhill under § 548(a)(1)(A) –

the only other type of action in those sections – Liptak would have to prove that he, the *debtor*,

made a transfer with the intent to hinder, delay, or defraud a creditor. Thus, he would be saying

that he made a transfer of money to Thornhill with the intent to hinder her collection action or to

defraud her – an unlikely and illogical type of avoidance action for him to bring as debtor-in-

possession.

### B. This Chapter 11's Effect on Primary Creditor Thornhill's Legal Rights and Liptak's Overriding Purpose for Filing This Case

A second, alternative test for determining whether a debtor has filed a Chapter 11 case in

good faith focuses on the Bankruptcy Code's effect on a judgment creditor's nonbankruptcy

collection rights and the legitimacy of the debtor's motive for impeding these rights. *See In re*

*Casey*, 198 B.R. 910, 916-18 (Bankr. S.D. Cal. 1996). If the debtor's only purpose for filing the

case is to delay (or defeat) a single judgment creditor, and the case has little or no ability to

benefit the creditor body as a whole, then the debtor has not filed the Chapter 11 in good faith.

*See Matter of Little Creek Development Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986); *In re N.R.*

*Guaranteed Retirement*, 112 B.R. 263, 276-77 (Bankr. N.D. Ill. 1990); *see also In re Marsch*, 36

F.3d 825, 828 (9th Cir. 1994); *Matter of Love*, 957 F.2d 1350, 1357-59 (7th Cir. 1992) (affirming

Chapter 13 dismissal for lack of good faith when debtor's motive was to avoid payment to a

single primary creditor, the IRS, by filing petition shortly after creditor commenced

garnishment); *In re Leavitt*, 209 B.R. 935, 940 (B.A.P. 9th Cir. 1997) ("[B]ad faith exists where

the debtor filed a petition only with the intention to defeat state court litigation. *In re Chinichian*,

21

784 F.2d 1440, 1445-46 (9th Cir. 1986).”), *affirmed*, 171 F.3d 1219 (9th Cir. 1999); *In re*

*International Oriental Rug Center*, 165 B.R. 436, 443 (Bankr. N.D. Ill. 1994). *Compare In re*

*Stump*, 280 B.R. 208, 214 n.2 (Bankr. S.D. Ohio 2002) (lack of good faith in filing a Chapter 7

case for same reasons);[6] *In re Carbaugh*, 299 B.R. 395, 398-99 (Bankr. N.D. Tex. 2003) (same);

*In re Huckfeldt*, 39 F.3d 829, 832-33 (8th Cir. 1994) (same). *But cf. In re Gleason*, 2002 WL

570647, at *2 (N.D. Ill. 2002) (stating that number of creditors is irrelevant to this inquiry). Both

a debtor's pre-filing and postfiling delays can bear upon this finding, though post-filing dilatory

tactics (which are not really at issue in this case) can constitute “cause” for dismissal all by itself

under § 1112(b)(3). *See In re N.R. Guaranteed Retirement*, 112 B.R. 263, 277 (Bankr. N.D. Ill.

1990); *Matter of Love*, 957 F.2d 1350, 1356, 1360 (7th Cir. 1992) (in Chapter 13 case, bad-faith

motive for filing can be inferred from both pre-petition and post-petition conduct).

One bankruptcy court faced with a very similarly situated Chapter 11 debtor found that

neither of the debtor's real purposes for interrupting the ex-wife's state-law collection remedies

---

[6]Identified factors for determining whether a Chapter 7 case was filed in good faith are substantially similar
to those for this Chapter 11 case. For example, the following list of considerations overlap with those identified in
the Chapter 7 *Stump* decision:

> 1. The debtor has reduced the creditor body to a single creditor immediately before filing; . . .
> 3. There is an intent to avoid payment of a large single debt that has been reduced to judgment;
> 4. The debtor did not try to repay; . . .
> 6. The debtor has sufficient resources to pay debts; . . .
> 11. The debtor showed a pattern to evade a single major creditor;
> 12. The debtor failed to make full disclosure;
> 13. The debts are modest in relation to assets and income;
> 14. There are multiple bankruptcy filings or other procedural "gymnastics."

*In re Stump*, 280 B.R. 208, 214 n.2 (Bankr. S.D. Ohio 2002) (quoting *In re Spagnolia*, 199 B.R. 362, 365 (Bankr.
W.D. Ky. 1995). Concerning factor number twelve, Liptak has failed to fully disclose the extent to which adverse
decisions were rendered against him in the state- and federal-court Texas litigation on various issues he decides to re-
wrap and re-present to this Court in contravention of the *Rooker-Feldman* doctrine. Concerning factor number
fourteen, the awkward (but technically permissible) legal maneuvers needed to remove and transfer purely local legal
disputes with county officers in Texas to the U.S. District Court for the Northern District of Illinois could be
construed as "procedural 'gymnastics.'"

were legitimate reorganizational purposes. *See In re Casey*, 198 B.R. 910 (Bankr. S.D. Cal. 1996). Specifically, (1) the use of the claims-objection process to mount a collateral attack on and relitigate the California divorce decree was an insufficient justification for the dispute to be in a U.S. bankruptcy court, even when considered in conjunction with (2) the use of the bankruptcy case as a substitute for an appeal bond staying enforcement of the divorce decree and with (3) the existence of additional secured and unsecured creditors, including one relatively small unsecured creditor who objected to dismissal. *See In re Casey*, 198 B.R. 910, 916-18 (Bankr. S.D. Cal. 1996); *see also Matter of Little Creek Development Co.*, 779 F.2d 1068, 1073-74 (5th Cir. 1986) ("[A] debtor may not counter allegations of bad faith solely with an attempt to relitigate the issues presented in its state court case."). In *Casey*, the timing of the filing was also an important consideration in the lack-of-good-faith finding, as the debtor filed the bankruptcy petition after the family court announced a tentative decision and was just about to enter a final judgment. *See In re Casey*, 198 B.R. 910, 911, 916 (Bankr. S.D. Cal. 1996).

This case is similar in that the timing is indicative of an intent to delay the primary creditor, the ex-wife, on the eve of her exercise of traditional state-law collection rights without posting an appeal bond. This bankruptcy petition was a remedy of last resort when, a full two years after Thornhill prevailed on her "bill of review" action, he could no longer find an effective legal method (other than an appeal bond) for warding off Thornhill's garnishment actions, the 68th Judicial District of Texas having declined to immediately grant an emergency temporary restraining order against Thornhill last July. This case is also similar in terms of Liptak's motive in filing this case and its anticipated effect on his primary creditor's rights. Liptak admits that he intends to attempt to discharge Thornhill's debt without any payment at all from his bankruptcy

23

estate by objecting to the claim under § 502(b) of the Bankruptcy Code. The Court believes that

Liptak's overriding purpose for filing this bankruptcy case is to use this statutory device as a

means to obtain another forum for retrying the "bill of review" suit challenging the property

settlement. In all likelihood this objection will be under the first subsection of § 502(b), the

broadest of the listed grounds, which requires disallowance "to the extent that--(1) such claim is

unenforceable against the debtor and property of the debtor, under any agreement or applicable

law for a reason other than because such claim is contingent or unmatured." Liptak believes that

Thornhill's 2001 judgment resulting from the "bill of review" jury verdict is void because of

various legal errors, such as the judge's errors in admitting evidence and faulty jury instructions.

### 1. The *Rooker-Feldman* Doctrine Problem

An unanticipated problem, though, is that § 502(b)(1) objections don't occur in a legal

vacuum; they are subject to and limited by other legal considerations such as the subject-matter

jurisdiction restrictions imposed by the *Rooker-Feldman* doctrine.[7]  *See In re Fiterman*, 1999 WL

1044811, at *3 (Bankr. D. Minn. 1999) (refusing to review argument that claim was

unenforceable by a corporation no longer existing because state court review had already rejected

argument); *In re Johnson*, 210 B.R. 1004, 1006 (Bankr. W.D. Tenn. 1997); March, Kathleen P.

& Hildebrandt, Jennifer, *The Many Ways to Win or Lose on Your Bankruptcy Issue in State

Court; or, Why Bankruptcy Lawyers and Judges Who Thought State Court Was Irrelevant to

Bankruptcy Practice Guessed Wrong*, 25 Cal. Bankr. J. 332, 343 (2000). This limitation prevents

---

[7]In determining whether a petition has been filed in good faith, a Court has some discretion to take a look at considerations that would normally arise for final determination during a later proceeding in the case, such as a plan-confirmation hearing, *Matter of Love*, 957 F.2d 1350, 1361 (7th Cir. 1992); *Matter of Woodbrook Associates*, 19 F.3d 312, 320 n.9, 322 (7th Cir. 1994), or, in this case, a claim-objection hearing.

federal courts of original jurisdiction from having subject matter jurisdiction to act as *de facto*
appellate courts for judgments rendered in any state-court system, *see In re Altman Nursing*, 299
B.R. 813, 819 (Bankr. N.D. Tex. 2003); March & Hildebrandt, *supra*, 25 Cal. Bankr. J. 332, 342-
43 (2000), and as such, it is a more significant limitation than any of the discretionary, prudential
abstention doctrines used to decline jurisdiction that really exists. *See* 28 U.S.C. § 1257; *Weekly
v. Morrow*, 204 F.3d 613, 614-15 (5th Cir. 2000). Under the *Rooker-Feldman* doctrine, federal
courts do not have subject matter jurisdiction to review and potentially reverse any rulings issued
by either lower or higher state courts, even if they misconstrue federal law. *See Brown & Root v.
Breckenridge*, 211 F.3d 194, 198, 199 (4th Cir. 2000); *FOCUS v. Allegheny County Court of
Common Pleas*, 75 F.3d 834, 840 (3d Cir. 1996); *Texaco v. Pennzoil Co.*, 784 F.2d 1133, 1142 (2d
Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987); *Schmitt v. Schmitt*, 165 F. Supp. 2d 789,
794 (N.D. Ill. 2001), *affirmed*, 324 F.3d 484 (7th Cir. 2003); *Weekly*, 204 F.3d at 615; *In re
Fiterman*, 1999 WL 1044811, at *3 (Bankr. D. Minn. 1999). Furthermore, they do not have the
authority to act as *de facto* appellate courts *vis-a-vis* state courts unless expressly authorized by
statute (such as the federal *habeas corpus* statute). *Reitnauer v. Texas Exotic Feline Found. (In re
Reitnauer)*, 152 F.3d 341, 343-44 (5th Cir. 1998). A federal court acts beyond the scope of
authority if the merits of the federal controversy are inextricably tied to the state-court judgment,
but it does not do so if the federal litigant presents an independent claim that, if meritorious, would
not effectively nullify the state-court judgment. *See Schmitt*, 324 F.3d at 486-87 (7th Cir. 2003);
*Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 996 (7th Cir. 2000); *Long v. Shorebank Dev.
Corp.*, 182 F.3d 548, 554-57 (7th Cir. 1999); *Centres v. Town of Brookfield*, 148 F.3d 699, 702
(7th Cir. 1998); *Breckenridge*, 211 F.3d at 198, 200-01; *Harris v. N.Y. State Dep't of Health*, 202

25

F. Supp.2d 143, 162-63 (S.D.N.Y. 2002); *In re Fiterman*, 1999 WL 1044811, at *3 (Bankr. D.

Minn. 1999). Courts in the Seventh Circuit apply this test by discerning whether the federal

claimant's injury was "only complete" once the state court issued a judgment upholding his

opponent's conduct or legal rights, and they find themselves without subject matter jurisdiction if

the injury was "only complete" at that time. *Fayyumi v. City of Hickory Hills*, 18 F. Supp.2d 909,

914-17 (N.D. Ill. 1998).

This test is easily applied to Liptak's challenge to Thornhill's claim in this bankruptcy

case, because it is the June 2001 state-court judgment reapportioning their property settlement

that is the real source of Liptak's primary disputed debt. He would have this Court re-conduct

the bill of review proceeding in the form of having it conduct a hearing on his forthcoming claim

objection. Thus, Liptak's overriding purpose for this bankruptcy case does not even involve the

type of dispute over which this Court has subject-matter jurisdiction. Having the bankruptcy

court disallow a claim under § 502(b)(1) because it is unenforceable under nonbankruptcy law is

possible if the enforceability issue has not been previously litigated in state-court litigation;

otherwise, the bankruptcy court does not have jurisdiction to readjudicate the issue.

The only limitations on the *Rooker-Feldman* doctrine that would permit a federal court of

original jurisdiction to retry a matter from a state-court civil action are explicit statutory ones,

such as the *habeas corpus* statute available for relief from criminal confinement, *see Ritter v.

Ross*, 992 F.2d 750, 753 (7th Cir. 1993), and full-faith-and-credit ones for judgments that are

deemed void for lack of personal jurisdiction, subject matter jurisdiction, or the most basic due-

process procedures, *see* 28 U.S.C. § 1738; *Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1020-21 &

n.6, 1027 (5th Cir. Unit B 1982); *Tronagun Corp. v. Mizerock*, 820 F. Supp. 225, 227-28 (W.D.

26

Pa. 1993). To determine whether a specific judgment is entitled to full faith and credit in federal court, the federal court must ascertain the deference that another trial court in the same state court system would give it as well as the judgment's compliance with very basic federal law principles. *See id.*; *Gauthier v. Continental Diving Services*, 831 F.2d 559, 561 (5th Cir. 1987); *cf. In re Altman Nursing*, 299 B.R. 813, 819 (Bankr. N.D. Tex. 2003); *In re Benalcazar*, 283 B.R. 514, 525 (Bankr. N.D. Ill. 2002). In Texas, a judgment is void when the rendering court "had no jurisdiction of the parties, no jurisdiction of the subject matter, no jurisdiction to enter the judgment, or no capacity to act as a court." *Browning v. Placke*, 698 S.W.2d 362, 363 (Tex. 1985); *see In re Altman Nursing*, 299 B.R. 813, 820 (Bankr. N.D. Tex. 2003). Other Texas authority takes the narrower view that potential defects relating to whether a state district court had personal jurisdiction, conducted a fair trial, or issued a decree generally said to violate Texas constitutional provisions do not render a judgment void; only lack of subject matter jurisdiction renders one void. *See Browning v. Placke*, 698 S.W.2d 362, 363 (Tex. 1985); *McEwen v. Harrison*, 345 S.W.2d 706, 710 (Tex. 1961); *Cook v. Cameron*, 733 S.W.2d 137, 140 (Tex. 1987); *Nguyen v. Intertex*, 93 S.W.3d 288, 294-95 & n.3 (Tex. App. 2002).

Liptak contends that Thornhill's 2001 judgment is null and void *ab initio* under these exceptions for a variety of reasons that, even under the broader Texas view or the basic limitations of federal law, do not subject it to collateral attack. Errors in the admission of evidence, the general application of law, the joinder of parties, and the instruction of a jury, for instance, are nonjurisdictional legal errors on matters over which the 255th Judicial District of Texas had authority to rule and could only be corrected by direct attack in the same jurisdiction; they result in a voidable, not a void, judgment. *See generally In re Altman Nursing*, 299 B.R.

813, 820-21 (Bankr. N.D. Tex. 2003); *Nguyen v. Intertex*, 93 S.W.3d 288, 294-95 (Tex. App.

2002); *Cook v. Cameron*, 733 S.W.2d 137, 140 (Tex. 1987); *Browning v. Placke*, 698 S.W.2d

362, 363 (Tex. 1985). Personal jurisdiction could not have been a problem for two Texas

residents conducting litigation in Texas courts. The issue of subject matter jurisdiction refers to a

court's authority to consider the merits of a particular type of legal dispute. *See Nguyen v.*

*Intertex*, 93 S.W.3d 288, 294 (Tex. App. 2002); *McEwen v. Harrison*, 345 S.W.2d 706, 709-11

(Tex. 1961). State trial courts such as the 255th Judicial District of Texas have, with few

exceptions, original and general subject matter jurisdiction to hear virtually any type of civil

dispute, including a "bill of review" action that is the Texas method for attacking an otherwise

final judgment on the merits, *see infra*. Texas law does indeed indicate that the proper type of

court, a district court, adjudicated both the divorce decree property division and the superceding

"bill of review" judgment. *See* **Tex. Const. art. 5, § 8** (Vernon 1993); **Tex. Gov't Code Ann. §§**

**24.007, 24.008, 24.601(c)** (Vernon 1988); *Williams v. Scanlan*, 714 S.W.2d 38, 39 (Tex. App.

1986); *cf.* **Tex. Gov't Code Ann.** § 27.031(b) (Vernon Supp. 1996) (justice courts, by

comparison, do not have jurisdiction over divorce suits). Liptak also received a jury trial in

which he was entitled to appear and present arguments to the judge and to the jury that ultimately

answered special interrogatory questions in favor of Thornhill.[8] The Court sees no evidence that

---

[8]    "The due process requirements in a civil case where only property interests are at
stake are, of course, much less stringent than in a criminal case involving life and
liberty interests. Thus ordinarily all that due process requires in a civil case is
proper notice and service of process and a court of competent jurisdiction;
procedural irregularities during the course of a civil case, even serious ones, will
not subject the judgment to collateral attack. *See Windsor v. McVeigh*, 93 U.S.
274, 282, 23 L. Ed. 914 (1876); 7 Moore's, *supra*, at P 60.25(2), p. 309-10."

*Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1027 (5th Cir. Unit B 1982).

would call into question the 255th Judicial District's capacity to function as a court of law. In

Texas, a judgment distributing money pursuant to a divorce decree is not considered void *ab*

*initio*, as opposed to being voidable on direct appeal, just because the judgment debtor

subsequently alleges that the legal errors giving rise to the judgment are violations of the state

due process clause and various other state constitutional provisions. *See Cook v. Cameron*, 733

S.W.2d 137, 140 (Tex. 1987). On the present record, the Court sees no full-faith-and-credit

obstacle to finding that the *Rooker-Feldman* doctrine deprives this Court of its power to even

consider the merits of the six years of litigation resulting in the June 11, 2001 judgment in the

original amount of $1,655.045.

      Liptak does present one specific and novel argument challenging the jurisdiction of the

255th Judicial District of Texas to render this judgment insofar as it reawards the $195,000 from

the Showa Denko lawsuit settlement to Thornhill. He contends that because the 68th Judicial

District's dismissal of his and Thornhill's personal injury lawsuit versus Showa Denko awarded

a portion of the settlement money to Thornhill and the remaining $195,000 to Liptak, and

because the 255th Judicial District's judgment on the bill of review reapportioned the property

settlement by awarding the $195,000 to Thornhill, the latter district improperly assumed

jurisdiction to open and revise the former district's final order of dismissal.

      It is true that after the passage of 30 days without an appeal or motion for a new trial, a

Texas judgment becomes final, and another trial court's order subsequently vacating the

judgment is void for lack of subject-matter jurisdiction judgment. *See McEwen v. Harrison*, 345

S.W.2d 706, 707, 709-11 (Tex. 1961). The final judgment at issue – here, the one in the Showa

Denko suit – can only be vacated after 30 days if the judgment was rendered without subject

matter jurisdiction or if the party opposing the final judgment successfully prosecutes a suit in equity known in Texas as a "bill of review." *See McEwen v. Harrison*, 345 S.W.2d 706, 709-10 (Tex. 1961); *Nguyen v. Intertex*, 93 S.W.3d 288, 294 (Tex. App. 2002).

Nevertheless, the question of whether the 255th Judicial District of Dallas County actually vacated, as a matter of law, the 68th Judicial District's 1995 consent judgment is an entirely different matter. Liptak's situation does not present any significant problem concerning the subject matter jurisdiction of the 255th District for two related reasons. First, the readjudication of the property division in the divorce case would redetermine the two parties' legal rights to specific property *vis-a-vis* each other as husband and wife; it would not reopen and redetermine their rights to money damages *vis-a-vis* Showa Denko, which was the only issue conclusively determined in the settlement and dismissal from the 68th Judicial District. Since the latter case apparently presented no cross-claim for decision, the Texas state court could not purport to make a final and unassailable apportionment of the settlement proceeds between the two parties when their legal liabilities and rights against one another were not the subject of the lawsuit. The 1995 apportionment of the proceeds from the personal injury suit *merely followed* the percentage stated in the (ultimately superceded) 1993 property-division decree (Liptak was entitled to 39% of the first $500,000, or $195,000), and the judgment from the 68th Judicial District did not purport to say that Liptak had an absolute right to the $195,000 against the entire world, only against Showa Denko, the opposing party.

Second, a bill of review was an appropriate procedural device that Thornhill could use to directly attack a judgment that has otherwise become final, such as the property settlement accompanying a divorce decree. A bill of review is an independent equitable suit to reopen a

30

judgment that is no longer appealable if the plaintiff establishes her *prima facie* case showing (1) a deprivation of a claim or defense (2) resulting from the defendant's fraud or breach of fiduciary duty and (3) unpaired with the plaintiff's own contributory negligence. *See McEwen v. Harrison*, 345 S.W.2d 706, 709-10 (Tex. 1961); *Nguyen v. Intertex*, 93 S.W.3d 288, 293 (Tex. App. 2002). A proper showing permits retrial of the original cause of action and reissues one new final judgment, *see id.*, but only by the same district rendering the final judgment under attack, *see Solomon, Lambert, Roth & Associates, Inc. v. Kidd*, 904 S.W.2d 896, 899-900 (Tex. App. 1995). Thornhill used this procedure to attack the original 1993 divorce decree from the 255th District, which is the only legal basis upon which the 68th Judicial District's 1995 apportionment of settlement proceeds could have proceeded. The 255th District's 2001 judgment in favor of Thornhill cannot be considered a true vacation of the 68th District's apportionment of the personal-injury lawsuit proceeds. Once a divorce case is reopened with the necessary preliminary showings, the division of property would be subject to reclassification and reapportionment in the bill of review proceeding. This is precisely what the 255th Judicial District of Texas did. Liptak is correct that it is reversible error for a Texas trial court to mischaracterize separate property consisting of specific types of personal-injury-suit proceeds as community property, which, unlike separate property, is subject to equitable division in a divorce case. *See Osborn v. Osborn*, 961 S.W.2d 408, 413-15 (Tex. App. 1997). But, because state courts clearly have the authority to characterize a divorcing couple's property as separate or community, any error would have to be corrected within that jurisdiction and would be "mere legal error on a matter over which [the court] has subject matter jurisdiction." March & Hildebrandt, *supra*, 25 Cal. Bankr. J. 332, 340-41 (2000) (citing *In re Pavelich*, 229 B.R. 777,

31

783 (B.A.P. 9th Cir. 1999)).

### 2. The § 523(a) Exception to Discharge Problem

A further problem with Liptak's primary purpose and direction for this case is that the claim disallowance tactic to be used as his main weapon against Thornhill might not effectively give him the relief he seeks even if he uses it successfully. That is, if this Court disallowed Thornhill's claim under § 502(b)(1) in violation of the *Rooker-Feldman* doctrine, such decision would only affect her right to receive a distribution according to a confirmed reorganization plan distributing Liptak's bankruptcy estate property or future earnings therefrom. 11 U.S.C. §§ 1126(c), 1129, 1141(d). It would not necessarily affect Thornhill's right to ultimately pursue collection of her prepetition debt even if Liptak discharged his debts upon confirmation of a Chapter 11 plan, because under either § 523(a)(4) (debts for fraud or breach of fiduciary duty) or § 523(a)(15) (debts for property division in divorce decrees), Thornhill might be able to pursue exceptions to the discharge injunction. 11 U.S.C. §§ 523(a), 1141(d). If she were to be successful in such an attempt, this bankruptcy case will have changed very little of the situation existing prepetition, its only result being unnecessary delay in the collection of the debt.

### 3. The Absence of a Corresponding Bankruptcy Code Policy to Offset the Delay and Other Adverse Impacts on Liptak's Creditors' Collection Rights

Aside from the legal hurdles surrounding Liptak's particular bankruptcy tactic against Thornhill, his purposes in filing this case constitute "cause" for dismissal. Even if his tactic of avoiding payment and liability fails for either of the above reasons, his motives and plans for filing this case have resulted in delaying further Thornhill's two-year attempt to realize her state-law rights without implicating a single one of the usual policies that the Bankruptcy Code was

32

designed to further.

For instance, one of the important purposes of bankruptcy law is to preserve the going-concern value of businesses and to treat creditors fairly and even-handedly, thereby making the debtor's creditor body as a whole better off in the long run than it would have been if no bankruptcy case were possible. The nature of this case is such that the benefit is solely for the debtor without any corresponding benefit to the creditor body. Given the extremely small number of creditors here, given that the debtor's main intent is to re-adjudicate and nullify (by means of a claim objection) the primary creditor's money judgment, and given that the debtor actually has liquid assets with which he could satisfy his obligations, the Court can scarcely discern any way in which this case would put the creditor body in a better position than it would have been in had bankruptcy relief not been possible; it will only delay them. *Cf. See In re Casey*, 198 B.R. 910, 911-14, 917 (Bankr. S.D. Cal. 1996) (dismissing similarly situated Chapter 11 debtor's bankruptcy case, even though he, unlike Liptak, was actually insolvent). Further, this is not a case that implicates one of the other primary creditor-oriented purposes of the Bankruptcy Code: the fair and ratable distribution of a debtor's assets to the creditor body. That concern is only implicated when, unlike here, insufficient assets exist to pay all claims, thereby presenting a danger that similarly situated creditors would receive unequal percentage recoveries on their claims if no bankruptcy intervention occurred. *Cf. id.* at 917 (all but one of the creditors supported dismissal for bad-faith filing even though possibility that ratable distribution would not occur).

The irony of Liptak's using a bankruptcy case in this situation is that because he is a Chapter 11 debtor-in-possession, he has a fiduciary obligation to his creditor body, *see*

33

*Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. 343, 355, 105 S. Ct. 1986, 1994 (1985), which in this instance is composed primarily of his ex-wife Thornhill. His fiduciary obligation is to his ex-wife when all of his efforts at reorganization are aimed at paying her as little as possible rather than at maximizing the dividend that the bankruptcy estate will pay her and Bourland Kirkman.[9] The likelihood that Congress intended that the special debtor-as-trustee provisions of Chapter 11 should be used as a weapon to gain leverage in battling one's ex-spouse in bitterly contested post-property-decree litigation is zero. If this case were not dismissed, Liptak's inability to perform his fiduciary obligation to Thornhill in this case would likely require the appointment of a Chapter 11 trustee or the conversion of the case to a Chapter 7 case with a Chapter 7 trustee, and either such trustee would simply use the liquid assets available here as part of the bankruptcy estate to pay Thornhill's claim in spite of any claim objection, as the *Rooker-Feldman* doctrine would probably require. If Liptak prevailed on every single aspect of this bankruptcy case as intended and achieved confirmation of some sort of plan, none of the four creditors listed would receive a single penny, and the bankruptcy court would constitute an alternative forum for enlarging the debtor's estate with lawsuits against Thornhill and other third parties in Texas. The use of a bankruptcy case in such a way that no money distributions leave the bankruptcy estate to pay any creditors and assets are only brought in through adversary proceedings is a perversion of the U.S. Bankruptcy Code.

In conclusion, the Court finds that "cause" for dismissal exists because Liptak did not file the instant Chapter 11 case in good faith, or, as other courts would alternatively explain it,

---

[9]Because Liptak is in fact solvent and has access to liquid assets, he could simply pay his $10,872 debt to Bourland Kirkman rather than using the more complex Bankruptcy Code to marshal, sell, and distribute assets of the bankruptcy estate for the purpose of maximizing such creditor's dividend.

because he did not invoke a legitimate reorganizational purpose of the U.S. Bankruptcy Code.

### C. The Existence of "Cause" for Dismissal with Prejudice

The Court has concluded that "cause" for dismissal under § 1112(b) has been established

because Liptak did not file this case in good faith. This type of "cause" for dismissal also

happens to establish "cause" for dismissal with a bar to refiling a bankruptcy case under § 349(a),

see In re Leavitt, 209 B.R. 935, 939 (B.A.P. 9th Cir. 1997), affirmed, 171 F.3d 1219 (9th Cir.

1999); In re Hall, 304 F.3d 743, 746 (7th Cir. 2002), because Liptak's behavior shows a

tendency toward taking his contentions and interpretations of law rejected by one court and then

recycling and re-presenting them to another court (in either the state or federal system) that does

not have appellate jurisdiction over the rulings over which he complains. A one-year bar would

be appropriate here to ensure that pending garnishment proceedings may proceed unabated by

additional automatic stays.

### D. The Pendency of Liptak's Adversary Proceeding Against Thornhill and the Required Nexus to a Pending Bankruptcy Case

Still pending is Liptak's Adversary Proceeding # 03-03732 against Thornhill. The only

reason a U.S. bankruptcy court has subject matter jurisdiction over any adversary proceeding at

all is because of its nexus to the underlying bankruptcy case pursuant to 28 U.S.C. §§ 157 and

1334. Therefore, the general rule is that a court's dismissal of a bankruptcy case should result in

the dismissal of each related adversary proceeding by separate order, because "federal

jurisdiction is premised upon the nexus between the underlying bankruptcy case and the related

proceedings." Fidelity & Deposit Co. of Md. v. Morris (In re Morris), 950 F.2d 1531, 1534-35

(11th Cir. 1992); see In re Statistical Tabulating Corp., 60 F.3d 1286, 1289 (7th Cir. 1995); Helms

*v. Arboleda (In re Arboleda)*, 224 B.R. 640, 647 (Bankr. N.D. Ill. 1998). The judicial-economy

exception to this general rule giving a bankruptcy court discretion to retain jurisdiction,

*Statistical Tabulating*, 60 F.3d at 1289; *Morris*, 950 F.2d at 1535; *Arboleda*, 224 B.R. at 647, is

not implicated in the present situation because this Court has not proceeded to adjudicate or try

the adversary proceeding in any fashion, even though cross motions for dismissal and for partial

summary judgment are currently pending. The dismissal of Liptak's underlying bankruptcy case

under § 1112(b), then, requires dismissal of the adversary proceeding for lack of subject matter

jurisdiction pursuant to Bankruptcy Rule 7012(h)(3), because the resolution of the controversy

would in no way impact the rights and duties of this debtor-creditor pair under the U.S.

Bankruptcy Code.

The foregoing opinion constitutes findings of fact and conclusion of law pursuant to

Bankruptcy Rules 9014 and 7052. This Amended Memorandum Opinion in no way alters or

modifies the final, separate order entered on January 6, 2004 pursuant to Bankruptcy Rule 9021.

Date:    January 22, 2004                    ENTERED:

_Jacqueline P. Cox_
_____

Jacqueline P. Cox
United States Bankruptcy Judge